Filed 7/12/18; Certified for Publication 8/8/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| DONNA COCHRUM, as Personal Representative, etc. | G052934 |
| Plaintiff and Appellant, | (Super. Ct. No. 30-2013-00679676) |
| v. | O P I N I O N |
| COSTA VICTORIA HEALTHCARE, LLC, et al., | |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Geoffrey T. Glass, Judge.  Affirmed.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Moran Law, Michael F. Moran, Lisa T. Flint and Alex H. Feldman for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Bryan R. Reid, Jeffry A. Miller and Brittany H. Bartold for Defendants and Appellants.

\*          \*          \*

Harvey Cohoon was diagnosed with a treatable form of cancer and was residing at Victoria Healthcare Center (Victoria Center), a skilled nursing facility, while he underwent treatment and recovered from various injuries he had suffered. For 19 days, Cohoon did well at Victoria Center. On the 20th day, he was observed to have difficulty swallowing thin liquids, and after an evaluation, his diet was changed. Although the evidence is in conflict, plaintiff contends that change was not properly communicated to the kitchen, and that night he was served a dinner that did not comport with his new diet. Less than 20 minutes after being served dinner, a nurse found him in respiratory arrest. The paramedics had to remove large pieces of chicken from his throat before intubating him. More pieces of chicken were removed from his airway at the hospital. He died the following day due to complications from oxygen deprivation to his brain.

Donna Cochrum, Cohoon's niece, filed the present lawsuit. As personal representative of Cohoon, she asserted causes of action for elder abuse and negligence. As personal representative of Cohoon's estate, Cochrum asserted a wrongful death cause of action. For simplicity, we simply refer to Cochrum as the plaintiff.

A jury returned a verdict in favor of Cochrum on all causes of action. It awarded $15,511.27 in economic damages, $900,000 in noneconomic damages on the elder abuse cause of action, and $350,000 in noneconomic damages for wrongful death. The court subsequently awarded Cochrum over $350,000 in attorney fees pursuant to the elder abuse claim. Subsequently, the court granted a motion for judgment notwithstanding the verdict (JNOV), finding insufficient evidence of recklessness to support the elder abuse cause of action. It also adjusted the remaining damages pursuant to Civil Code section 3333.2.[1] Cochrum appealed from the amended judgment,

---

[1] Civil Code section 3333.2 is part of the Medical Injury Compensation Reform Act of 1975 (MICRA). (Stats. 1975, 2d Ex. Sess. 1975, Ch. 1, § 1.191.) Section 3333.2, subdivision (b), limits the recovery for noneconomic damages against a health

2

contending the evidence supported the elder abuse cause of action. Two of the defendants cross-appealed, contending the court improperly applied the MICRA cap. We affirm the amended judgment.

FACTS

In 2012, Harvey Cohoon was at a restaurant with his niece, plaintiff Donna Cochrum, when he suddenly fell. Later that night, he passed out in the bathroom, fell again, and knocked out multiple teeth. A week later, he visited his doctor, who recommended he be taken immediately to the emergency room at Hoag Hospital, where he was admitted. In the preceding year, Cohoon had been living independently.

The treating physician reported Cohoon was weak, had experienced a lack of appetite, and had lost 40-50 pounds over the course of three months. He also had type 2 diabetes that was being treated with medication, but not insulin.

Cohoon was diagnosed with colon cancer. The cancer was not considered aggressive, and was at stage 2. As a result, his prognosis was relatively good: the doctor believed there was "very high hope" he would live another eight to nine years. Cohoon started a treatment plan involving both chemotherapy and radiation.

While Cohoon was undergoing treatment, he was moved from the hospital to Victoria Center, a skilled nursing facility operated by defendant Costa Victoria Healthcare, LLC (Costa Victoria). This placement was not meant to be long-term—only for the duration of his treatment. Cochrum drove Cohoon to his daily radiation and chemotherapy appointments.

When Cohoon was admitted to Victoria Center, he was malnourished, had a stage 3 pressure ulcer, and had muscle wasting. The staff performed a comprehensive

---

care provider based on professional negligence to $250,000. Hereafter, we will sometimes refer to section 3333.2, subdivision (b), as the "MICRA cap."

assessment regarding physical therapy, occupational therapy, pain management, and his various medical issues. Additionally, Victoria Center staff performed a social services admission evaluation, an activity admission evaluation, a nutrition risk review, and a dietary admission assessment. Based on those evaluations, the staff prepared an extensive care plan to address problems he was facing, including constipation, risk of falling, skin integrity, visual impairment, toileting, activity/recreation, occupational therapy and physical therapy.

For the first 19 days of his stay at Victoria Center, Cohoon improved. His protein levels improved and he was gaining weight, notwithstanding his cancer treatment. Cochrum's husband testified that Cohoon had a positive outlook, was getting stronger, was eating well, and seemed to be doing better than he had been doing at the hospital. Another relative testified it was obvious Cohoon was "getting better day by day."

On December 27, 2012, the day before Cohoon died, a nurse observed Cohoon coughing when ingesting thin liquids and ordered a speech therapist to evaluate him the following day. In the meantime, a short-term care plan was created indicating Cohoon should be checked periodically during meals and monitored for coughing. There is no indication that any other staff observed Cohoon coughing or having trouble with food that day.

The following morning, the speech therapist evaluated Cohoon by performing a "bedside swallow evaluation." Addressing swallowing problems (dysphagia) is part of the job description of a speech therapist and, in fact, was the majority of what this particular speech therapist did at Victoria Center. The evaluation entailed an examination of various aspects of Cohoon's mouth that are involved in chewing and swallowing. The speech therapist introduced different foods and liquids of varying consistency to determine what Cohoon could safely ingest. The speech therapist concluded Cohoon's swallowing inability was "severe" with regard to liquids. Accordingly, she changed his diet to "pudding thick" liquids. Cohoon was "slow but

4

functional" in chewing mechanical-soft textured food (i.e., food that was pre-cut by the kitchen in half an inch or smaller pieces.  The speech therapist changed his food diet to mechanical-soft because he was missing some teeth that are important in chewing and she felt mechanical soft was safest.  However, in the food tests the speech therapist did not detect any signs of aspiration (food entering the airway).  There is a more severe diet called the "dysphagia mechanical soft" diet, which is more ground up than the standard mechanical soft diet, but the speech therapist felt Cohoon was safe on the standard mechanical soft diet.  The speech therapist also recommended Cohoon be "distant supervised" during meals, which meant he was to be checked on two or three times during a meal.

When a speech therapist changes a diet, Victoria Center policy is that the speech therapist fills out a diet change card in duplicate, with one copy going to the kitchen, and the other to the nurses.  Cohoon's speech therapist testified that she did so, and the dietary services supervisor testified she received the form from the speech therapist, but neither copy of the diet change form was ever produced.  One copy is supposed to be in the nursing chart.  Moreover, the dietary services supervisor testified she entered the diet change in her computer, but there was no documentary evidence of the computer entry.

Cohoon's dietician spoke to the speech therapist the same morning, after the evaluation.  After the conversation, the dietician made a note in Cohoon's nursing chart noting Cohoon would be placed on "thickened liquids (pudding thick)," but the note said nothing about a mechanical soft diet.

At around the same time, a nurse filled out a daily assessment of Cohoon.  She checked the box indicating he had no difficulty swallowing, and checked the "Not Applicable" box for mechanically altered diet.  Under "Eating," she also checked the boxes for "Independent—No help or staff oversight at any time" and "Set-up Help Only."

Nurse Grimble, who was assigned to Cohoon's station for the afternoon/evening shift, spoke with the dietician about the changed recommendations for Cohoon, including both liquids and a mechanically soft diet. He noticed that the diet change order had been made at 10:23 a.m., but had not been entered in Cohoon's nursing records, as it should have been. At 4:27 p.m., Nurse Grimble entered the diet change order in the nursing records, and also made corresponding changes in the medical administration record. But none of these records went to the kitchen, and Grimble did not fill out a dietary communication form to inform the kitchen of the change.

At approximately 5:12 p.m., on December 28, 2012, Cohoon's dinner meal was served in his room. The standard practice at Victoria Center was that a nurse would check everyone's meal to ensure it was correct, though the nurse charged with doing so could not specifically remember checking Cohoon's meal. The dinner that night was baked chicken oregano. At approximately 5:30 p.m., Nurse Grimble was passing Cohoon's room and noticed him sitting up in the middle of dinner.[2] He tried to get Cohoon's attention, but was unable to, so he went in to investigate. He tried unsuccessfully to arouse Cohoon, and then checked for breathing and a pulse. He had a pulse, but was not breathing. Nurse Grimble then initiated a code blue. CPR was initiated, 911 was called, and Cohoon's family was notified of the situation.

Prior to initiating CPR with an Ambu bag,[3] Nurse Grimble did a finger sweep of the inside of Cohoon's mouth to ascertain if any food particles were present. He found none and began using the Ambu bag. He did not attempt to look deeper in Cohoon's throat for lodged food. He did not perform the Heimlich maneuver, though he had learned the maneuver in nursing school. He did not believe Cohoon had choked

---

[2] Nurse Grimble's report lists the time as 5:40 p.m., but the paramedics' report stated they were dispatched at 5:31 p.m.

[3] An Ambu bag is a mask with a bag attached. The mask goes on the patient and the bag is squeezed repeatedly to deliver air to the patient's lungs.

because, in addition to finding no food in his finger sweep, he observed Cohoon's chest to be rising and falling while using the Ambu bag.

The paramedics were dispatched at 5:31 p.m., by the time they reached Cohoon six minutes later, he was in full respiratory and cardiac arrest. One of the paramedics attempted to intubate Cohoon but found that he could not see Cohoon's vocal chords. The paramedic initially thought Cohoon had an abnormal skin flap there, but later realized food was blocking his view and used forceps to remove the food. The paramedic removed at least two solid pieces of chicken, though he could not recall the exact size. He testified the chicken pieces were at least as large as a dime. Another paramedic estimated one of the pieces was the size of a quarter, and the other roughly double that size. The first paramedic would later report that Cohoon had a "total obstruction" of his airway, but at trial clarified he was simply assuming that based on what he saw. After removing the chicken, he was able to intubate Cohoon. The paramedics then transferred Cohoon to the emergency room at Hoag Hospital at approximately 6:00 p.m.

Nurse Grimble testified that, sometime after Cohoon was taken to the hospital, he investigated the food Cohoon had been eating and observed it to be mechanically soft chopped food, which he confirmed with the kitchen to be correct.

Cohoon was treated in the emergency room by Dr. John Riel, who testified at trial as both an expert and a percipient witness. When Cohoon arrived at the emergency room, the paramedics had managed to restore his pulse. Dr. Riel's first task was to ensure the tube into Cohoon's airway was properly situated. As he examined the tube through a camera, he found more chicken in Cohoon's airway. Dr. Riel removed approximately 10 pieces of chicken from the airway ranging in size from the size of a dime to a quarter.

Cohoon was eventually moved from the emergency room to the intensive care unit, where Dr. Usman Shah took over his care. Dr. Shah performed tests to

7

determine that Cohoon did not suffer a heart attack. A radiologist found indications Cohoon had suffered brain damage from a lack of oxygen. Ultimately, Cohoon passed away the following day. Dr. Riel opined that Cohoon sustained a complete airway obstruction from the chicken pieces in his airway, leading to respiratory arrest, which led to cardiac arrest, and, in turn, brain death and death itself.

Cochrum, as representative of Cohoon's estate, as well as his personal representative, filed suit, pleading causes of action for elder abuse (Welf. & Inst. Code, § 15600 et seq.), negligence, violation of the patients' bill of rights (Health & Saf. Code, § 1430, subd. (b)), and wrongful death. The defendants were Costa Victoria Healthcare LLC; The Ensign Group, Inc. (Ensign Group); The Flagstone Group, Inc. (Flagstone); and Ensign Facility Services, Inc. (Ensign Services).

Flagstone was the sole owner of Costa Victoria.[4] Flagstone operated 42 nursing facilities in California. Ensign Group owns Flagstone as well as the remaining defendant, Ensign Services. Flagstone provided consulting services for Victoria Center. Flagstone did not directly perform nursing services for Victoria Center. However, Flagstone employed the licensed administrator for Victoria Center, David Jorgenson. Ensign Services provided back-end services such as information technology, legal, and accounting services. Ensign Services and Flagstone shared 5 percent of the gross revenues generated by Victoria Center.

At trial, Cochrum presented the testimony of a nursing expert who offered various theories of how Costa Victoria breached its duty of care.

First, she opined Victoria Center was inadequately staffed. Of the 61 residents on the evening of December 28, 2012, 43 had special mealtime needs. Twelve needed full one-on-one assistance with feeding; seven required extensive assistance; and 24 (including Cohoon) required supervision and monitoring. There were three licensed

---

[4] Although the record is somewhat unclear, presumably Flagstone owned Costa Victoria LLC, not merely the facility.

nurses and five certified nursing assistants working that night. The expert opined this was inadequate to meet the residents' needs. She opined Victoria Center needed "at least another one or two nurse aides or even an additional licensed staff . . . ." In support of this argument, Cochrum introduced evidence from resident council meetings (where residents met with staff to discuss concerns) in the months preceding Cohoon's death. A staff member would attend these meetings and report back to leadership. Between September and December 2012, the residents complained that they had to wait a long time for their call lights to be answered, particularly during meals, and they suggested additional staffing.

According to Cochrum's nursing expert, this failure to adequately staff led to the next breach of the duty of care: the failure to adequately monitor Cohoon during his meal. She opined: "When someone like this receives a new diet order—and with the diagnosis of severe dysphagia, it would be very important, on that first meal, this new diet, that he be given the opportunity to be coached and monitored during a period of 10, 15 minutes, initially, to make sure that he's adapting well, that he's chewing and swallowing adequately, and, also, to go back and spot-check him through his meal to make sure he was safely eating. This was not done."

Cochrum's nursing expert opined there were multiple breaches of the duty of care in connection with the service of Cohoon's final meal: the failure to effectively communicate Cohoon's diet change to the staff; the failure to check Cohoon's meal before giving it to him; and, ultimately, the failure to provide Cohoon the proper meal.

Cochrum's nursing expert went on to opine that Nurse Grimble breached his duty of care in failing to perform the Heimlich maneuver on Cohoon when he was found unresponsive. In that same vein, Cochrum's expert opined that Costa Victoria's failure to provide in-service training on choking for the nurses over the preceding year was a breach of the duty of care.

Cochrum also presented the testimony of an expert on the management of nursing homes. His testimony was directed at Flagstone, as the employer of David Jorgenson, the licensed administrator of Victoria Center. He opined that the failure to have a licensed nursing home administrator on the premises more often was a breach of the duty of care. This was based on testimony from Jorgenson that he spent approximately four to five hours per week on the premises (he spent most of his time at a different nursing home, though he testified he spoke with the operations manager of Victoria Center daily). The actual duty, according to the expert, is to be on the premises a "sufficient number of hours in order to render the highest level of physical, mental, and psychosocial well-being of each resident."

The administrative expert also testified concerning understaffing at Victoria Center. He noted that Victoria Center did satisfy the minimum legal requirement of the number of staff at the facility. However, he opined that the minimum legal requirement in this case was insufficient to meet the actual needs of the residents, which is a paramount duty.

The jury returned a verdict in favor of Cochrum and against Costa Victoria and Flagstone on all claims except for the Patient's Bill of Rights cause of action (Health & Safety Code, § 1430, subd. (b)), which had been settled prior to trial.[5] The jury found Costa Victoria and Flagstone were negligent and apportioned the fault 80 percent Costa Victoria and 20 percent Flagstone. On the negligence claim, the jury awarded $15,511.27 in economic damages. On the wrongful death claim, the jury awarded $350,000 in noneconomic damages. On the elder abuse claim, the jury awarded $900,000 in noneconomic damages. It found both that Costa Victoria's and Flagstone's officer/director/managing agent was negligent, and that Costa Victoria's and Flagstone's

---

[5] The jury rendered a verdict in favor of Ensign Services, which is not a party to this appeal. Henceforth, any reference to defendants excludes Ensign Services.

10

employees acted recklessly.  Finally, the jury found Flagstone and Costa Victoria were engaged in a joint venture.

Before judgment was entered, Cochrum moved for attorney fees under the Elder Abuse Act (Welf. & Code, § 15600 et seq.) and the Patient's Bill of Rights (Health & Saf. Code, § 1430, subd. (b); Cal. Code Regs., tit. 22, § 72527).  She sought a lodestar award of $657,745.50 with a multiplier of 2.0 for a total award of $1,315,495.  The court awarded fees in the amount of $346,573.

Over Cochrum's objection, the court reduced the awards for wrongful death and elder abuse to $250,000 each pursuant to Civil Code section 3333.2.  The court apportioned the damages consistent with the jury's findings, $200,000 against Costa Victoria, and $50,000 against Flagstone on each award.  It entered judgment accordingly.

Postjudgment, Costa Victoria and Flagstone moved for a new trial and JNOV.  Cochrum responded with a "motion to vacate and enter new judgment."  The court granted defendants' JNOV motion, and, in the alternative, granted defendants' new trial motion in the event the judgment is reversed on appeal.

The court acknowledged there was substantial evidence to support the findings that Cohoon was not served a mechanically soft chopped meal, that Costa Victoria was negligent in failing to serve Cohoon the proper meal, and that Costa Victoria failed to adequately monitor Cohoon during the meal.  "What the jury got wrong, however, was the verdict that the acts of the facility amounted to elder abuse under the Elder Abuse Act."  Relying heavily on *Worsham v. O'Connor Hospital* (2014) 226 Cal.App.4th 331 (*Worsham*), the court concluded defendants' conduct amounted to negligence, but not recklessness as required to support a claim for elder abuse.  The court reasoned, "the entire episode concerning Mr. Cohoon was over in less than twelve hours, from the change in dietary plan to the choking.  There were no complaints to the facility and no ongoing refusal to provide service and no evidence that Mr. Cohoon had been abused or was in any danger before being served his meal."  After a review of case law,

11

the court concluded "something more than a failure to comply with a care plan is required to show recklessness. The common elements of the cases are knowledge of inadequate care plans, neglect over time, and failure to provide needed care." The court found the acts of defendants here were "qualitatively and quantitatively different from the types of acts supporting inferences of recklessness under case law."

The court denied Cochrum's motion to vacate the judgment and entered a new judgment "except to the extent that the court agrees that the judgment should correctly modify the MICRA cap. Flagstone is not subject to the MICRA cap, but Costa Victoria is . . . . Thus, the correct judgment should be $70,000 against Flagstone and $250,000 against Victoria." The final judgment thus awarded a total of $320,000 on the wrongful death claim, and nothing, including no attorney fees, on the elder abuse claim. Cochrum timely appealed from the judgment and postjudgment orders. Flagstone and Costa Victoria cross-appealed from the judgment.

DISCUSSION

*The Court Did Not Err in Granting JNOV on the Elder Abuse Claim*

The first issue we address is whether the court properly granted JNOV on the elder abuse claim on the ground there was no substantial evidence of recklessness. "An order granting JNOV is reviewed de novo. A reviewing court determines whether substantial evidence supports the verdict, considering the evidence in the light most favorable to the party obtaining the verdict." (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 573.) "The court must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict." (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782.)

12

"Pursuant to the Elder Abuse and Dependent Adult Civil Protection Act [(Welf. & Inst. Code, § 15600 et seq.)], heightened remedies are available to plaintiffs who successfully sue for dependent adult abuse.  Where it is proven by clear and convincing evidence that a defendant is liable for neglect or physical abuse, and the plaintiff proves that the defendant acted with recklessness, oppression, fraud, or malice, a court shall award attorney fees and costs.  Additionally, a decedent's survivors can recover damages for the decedent's pain and suffering."  (*Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 88.)

"[O]ne of the main purposes of [Welfare and Institutions Code] section 15657 was the elimination of the institutional abuse of the elderly in health care facilities." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 35-36.) The statute was intended "to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect." (*Id*. at p. 33.)

The Elder Abuse Act requires proof of either "physical abuse . . . , or neglect . . . , and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse."  (Welf. & Inst. Code, § 15657.)  Welfare and Institutions Code section 15610.57 includes both a general definition of "neglect" and specific examples. The general definition is; "The negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (*Id.*, subd. (a)(1).)  The statute then provides that neglect "includes, but is not limited to," "(1) Failure to assist in personal hygiene, or in the provision of food, clothing, or shelter."  "(2) Failure to provide medical care for physical and mental health needs."  "(3) Failure to protect from health and safety hazards."  "(4) Failure to prevent malnutrition or dehydration."  (*Id.*, subd. (b)(1)-(4).)

"Recklessness involves '"deliberate disregard" of the "high degree of probability" that an injury will occur' and 'rises to the level of a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it."'"

13

(*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 405 (*Carter*).) "'Recklessness' refers to a subjective state of culpability greater than simple negligence . . . [citations]. Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' . . . ." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 31.) "[T]o obtain the [Elder Abuse] Act's heightened remedies, a plaintiff must allege conduct essentially equivalent to conduct that would support recovery of punitive damages." (*Covenant Care*, *Inc. v. Superior Court* (2004) 32 Cal.4th 771, 789.)

To make the concept of recklessness more concrete, *Carter*, *supra*, 198 Cal.App.4th 396, provided a helpful review of cases upholding a finding of recklessness. We quote it at length:

"Examples of cases involving conduct sufficiently egregious to warrant the award of enhanced remedies under the Elder Abuse Act include the following:

"—A skilled nursing facility: (1) failed to provide an elderly man suffering from Parkinson's disease with sufficient food and water and necessary medication; (2) left him unattended and unassisted for long periods of time; (3) left him in his own excrement so that ulcers exposing muscle and bone became infected; and (4) misrepresented and failed to inform his children of his true condition. (*Covenant Care, supra,* 32 Cal.4th at p. 778.)

"—An 88-year-old woman with a broken ankle 'was frequently left lying in her own urine and feces for extended periods of time' and she developed pressure ulcers on her ankles, feet and buttocks that exposed bone, 'despite plaintiff's persistent complaints to nursing staff, administration, and finally, to a nursing home ombudsman.' (*Delaney, supra,* 20 Cal.4th at pp. 27, 41.)

"—A facility caring for a dependent adult with a known condition causing progressive dementia, requiring nutrition and hydration through a gastrostomy tube, and subjecting her to skin deterioration, ignored a medical care plan requiring the facility to

14

check the dependent adult's skin on a daily basis and failed to notify a physician when pressure ulcers and other skin lesions developed.  (*Sababin v. Superior Court, supra,* 144 Cal.App.4th [81, 83-87, 90].)

"—A 78–year–old man admitted to a skilled nursing facility 'was abused, beaten, unlawfully restrained, and denied medical treatment.'  (*Smith* [*v. Ben Bennett, Inc.* (2005)] 133 Cal.App.4th [1507, 1512].)

"—The staff of a nursing home: (1) failed to assist a 90-year-old, blind and demented woman with eating; (2) used physical and chemical restraints to punish the elder and prevent her from obtaining help; and (3) physically and emotionally abused the elder by bruising her, 'withholding food and water, screaming at her, and threatening her.'  (*Benun v. Superior Court* (2004) 123 Cal.App.4th 113, 116-117 [citation].)

"—A skilled nursing facility (1) failed to provide adequate pressure relief to a 76-year-old woman with severe pain in her left leg and identified as at high risk for developing pressure ulcers; (2) dropped the patient; (3) left 'her in filthy and unsanitary conditions'; and (4) failed to provide her the proper diet, monitor food intake and assist with eating.  (*Country Villa Claremont Healthcare Center, Inc. v. Superior Court* (2004) 120 Cal.App.4th 426, 430, 434-435 [citation].)

"—A physician 'conceal[ed] the existence of a serious bedsore on a nursing home patient under his care, oppose[d] her hospitalization where circumstances indicate[d] it [was] medically necessary, and then abandon[ed] the patient in her dying hour of need.'  (*Mack v. Soung* (2000) 80 Cal.App.4th 966, 973 [citation].)"  (*Carter, supra,* 198 Cal.App.4th at pp. 405-406.)

Turning to the facts of this case, we find no substantial evidence of recklessness.  The facts of the present case do not resemble the facts of the cases summarized above.  Nor, on a more abstract level, do we find any evidence in the record of deliberate conduct undertaken despite knowledge of a probable injury to Cohoon.

15

Cochrum offers various examples of conduct she deems reckless, but we find none of them persuasive.

Cochrum first points to what she describes as "recklessly inadequate staffing." She contends: "Simply put, the staff was too thinly stretched to provide the individual attention the residents needed during meal times." Assuming the jury credited Cochrum's expert testimony that one or two additional staff members should have been present, however, there is no evidence the understaffing was reckless. In particular, there is no evidence that defendants should have known that one or two additional staff members was the difference between life and death. There is no evidence, for example, that inadequate staffing levels had led to previous safety issues. To the contrary, for the first 19 days of Cohoon's stay, he seemed to be receiving good care. He had no complaints and his health was visibly improving. For 19 days he seemed to be doing well on an ordinary diet. And when he began coughing on thin liquids, he was immediately given a short-term care plan, and then was evaluated by a speech therapist in short order. In other words, the staffing had been adequate for his needs up to that point. There was nothing indicating that one or two additional staff members was clearly necessary for Cohoon's safety.

Cochrum places much weight on the resident council reports recommending additional staff and complaining about wait times. Those reports, however, indicate only that residents were unhappy with wait times, and that staff at times appeared hurried. There is nothing in those reports to suggest the staffing levels created a safety hazard. In hindsight, of course, it is easy to see how additional staff may have led to more monitoring and possibly even saved Cohoon, but there was nothing at that time to suggest that the staffing levels had created an imminent hazard. Nor was there any evidence that management was pressuring Costa Victoria to reduce staffing to unsafe levels for economic reasons. Moreover, Costa Victoria met the legal minimum staffing levels for the number of patients they had.

16

In concluding Cochrum had failed to present evidence of recklessness, the trial court relied on *Worsham, supra*, 226 Cal.App.4th 331. There, the plaintiff had broken a hip and, after surgery, was in the transitional care unit of a hospital to recover. While there, she fell again, breaking more bones. (*Id.* at p. 334.) The plaintiff filed a complaint, alleging the transitional care unit "was understaffed and undertrained, and that the lack of sufficient well-trained staff caused Ms. Worsham's fall." (*Ibid.*) The court affirmed a sustained demurrer, stating, "The allegations in the second amended complaint are not sufficient to render [the defendant's] conduct in failing to provide adequate staffing anything more than professional negligence." (*Id.* at p. 338.) Similarly, here, a slight understaffing, without any indication that it created an imminent risk of harm, does not amount to recklessness.

On the other hand, we recognize that, as the court held in *Fenimore v. Regents of the University of California* (2016) 245 Cal.App.4th 1339, understaffing can amount to recklessness under the right circumstances. There, the court reversed the sustaining of a demurrer (*id*. at p. 1342), where the complaint alleged a hospital had "a pattern and knowing practice of improperly understaffing to cut costs" (*id.* at p. 1349). The court did not explain what sort of pattern or practice would suffice, nor how drastic the understaffing would have to be to amount to recklessness. But, we agree that, at least in principle, understaffing could amount to recklessness if it is sufficiently egregious. That was not the case here.

Next, Cochrum contends the evidence demonstrated "recklessly inadequate training." Here, she focuses on the evidence that the licensed nurses had not received continuing education on choking during the year 2012. She cites California Code of Regulations, title 22, section 72517, which requires skilled nursing facilities to maintain "an ongoing educational program planned and conducted for the development and improvement of necessary skills and knowledge for all facility personnel." The program must include, but is not limited to, a list of 10 topics, one of which is "[c]hoking

17

prevention and intervention." (*Id.* at subd. (a)(10).) At trial, multiple staff members testified that they attended ongoing educational programs, but defendants were unable to produce any sign-in sheets demonstrating that licensed nurses attended any programs. From this, the jury could conclude the licensed nurses did not attend educational programs as required.

Even so, this did not amount to "egregious" misconduct akin to that which would warrant punitive damages. The evidence showed Costa Victoria did have an ongoing educational program addressing a multitude of topics, including choking. The sign-in sheet from the choking program, in April 2012, shows that 16 staff members attended, though all were certified nursing assistants rather than licensed nurses. Nevertheless, the evidence showed that all nurses were CPR certified, and as part of that training they had to be trained on choking prevention at least every two years. Cochrum has not cited any authority indicating all staff must be trained on choking prevention every year. The regulation above requires an ongoing educational program, as well as topics that must be covered in the program, but is no more specific than that.

Moreover, there is no evidence in the record that a lack of training caused Cohoon's death. Nurse Grimble, who was the first to encounter Cohoon unresponsive, testified that his life support certification was current as of December 2012. Nurse Grimble knew how to perform the Heimlich maneuver, but chose not to because he did not believe Cohoon was choking. He performed a finger sweep of Cohoon's mouth, found no food, and saw Cohoon's chest rising and falling with the use of the Ambu bag. There is nothing in the record to suggest that an additional educational program on choking prevention would have changed anything. Nor, more importantly, did defendants have any reason to believe the lack of a choking program presented an imminent risk of death, such that the failure to ensure licensed nurses attended a program was reckless. The failure to require licensed nurses to attend a choking program that year was, at most, negligent.

Next, Cochrum contends the evidence supports a finding of a "reckless failure to monitor." The fundamental problem with Cochrum's argument is there was no evidence the failure to monitor was intentional, or that the staff was indifferent to Cochrum's plight. Nurse Grimble testified he was not aware of any specific supervision order, but agreed patients with dysphagia normally require some type of supervision, and that the staff in general was performing that function, though no one person was assigned to monitor Cohoon. And Nurse Grimble did check on Cohoon. He recorded that Cohoon's dinner was served at 5:12 p.m. that evening. The paramedics were called at 5:31 p.m. At most, therefore, Nurse Grimble waited 19 minutes to check in on Cohoon (he testified that he thought it was approximately 15 minutes). The jury could certainly find that more frequent monitoring was warranted, but 19 minutes is not *egregious*. Moreover, so far as Nurse Grimble was aware, Cochrum had received the proper food, and thus he had no reason to believe Cohoon was in imminent danger of choking. There is simply nothing in this record to suggest the staff was acting with callous indifference.

Finally, Cochrum asserts the evidence supports a finding of a "reckless failure to provide the correct diet." Once again, however, there is no evidence Cohoon was intentionally given the wrong diet or that the staff was indifferent to Cohoon's swallowing difficulty. On the contrary, the evidence shows that when the staff initially noticed Cohoon struggling, they moved promptly to address the issue. Ultimately, there was evidence showing there was a failure of communication somewhere along the way, such that the kitchen staff provided the wrong meal and the nursing staff failed to notice the discrepancy, but there is no evidence that the miscommunication was intentional or born of callous indifference.

Because we find there is no substantial evidence that defendants acted recklessly, we conclude the court properly granted JNOV. Accordingly, we need not address the grant of the new trial motion, as it was applicable only in the event the JNOV ruling was reversed. Additionally, Cochrum contends the court erred in not awarding

19

separate awards of $250,000 against Flagstone and Costa Victoria under the Elder Abuse Act. Since we affirm the judgment for defendants on that claim, we need not address this issue. Likewise, Cochrum contends the award of attorney fees pursuant to the Elder Abuse Act was insufficient. That argument is also moot in light of our holding.

*The Court Did Not Err in Not Granting the JNOV in Full*

We turn now to the cross-appeal. Defendants raise two issues.

First, they contend there is insufficient evidence to support all causes of action, and thus the court should have granted their JNOV motion in full and entered a complete defense judgment. Their argument focuses on causation: they argue there was insufficient evidence that Cohoon choked to death, and thus insufficient evidence that defendants' negligence caused Cohoon's death. Essentially, their argument is that no one actually saw Cohoon's airway completely blocked (the EMT said only that he could not see Cohoon's vocal chords, not that he confirmed the airway was completely obstructed). Moreover, Nurse Grimble saw Cohoon's chest rising and falling while using the Ambu bag, which is inconsistent with an obstructed airway.

We reject that contention. Cochrum's medical expert (who actually treated Cohoon in the emergency room) opined that Cohoon choked, and overwhelming circumstantial evidence supported his opinion. Cohoon had been recently diagnosed with swallowing difficulty and his diet was modified. That diet change was not properly communicated to the kitchen. He was found in respiratory arrest with large pieces of chicken preventing intubation. At the hospital, 10 additional significant-sized pieces of chicken were removed from his airway. And the hospital physicians ruled out a heart attack as the cause. It is hard to imagine a more compelling circumstantial case.

The fact that Nurse Grimble *believed* he saw Cohoon's chest rise and fall is not enough to obviate the overwhelming circumstantial evidence that Cohoon choked. In the heat of the moment, Nurse Grimble may well have been mistaken. Or, perhaps the

20

finger sweep inadvertently dislodged enough food to permit air to pass. Or, perhaps the force of the Ambu bag itself was enough to dislodge food. The point is: the record is not adequate to definitively establish that Nurse Grimble's testimony, and the inference defendants draw from it, are unassailable. We must draw inferences in favor of the judgment.

Second, defendants contend the MICRA cap on damages for wrongful death applies to both Costa Victoria and Flagstone. The court held Flagstone's liability was not capped. It calculated damages for the wrongful death claim as follows: the jury awarded $350,000. It apportioned 80 percent of the fault to Costa Victoria, and 20 percent to Flagstone, which equates to $70,000 for Flagstone and $280,000 for Costa Victoria. MICRA applies to Costa Victoria, not Flagstone. Therefore, Costa Victoria's liability was reduced to $250,000, while Flagstone's remained $70,000, for a total award of $320,000. Defendants contend the award should have been limited to a total of $250,000. We disagree.

MICRA "was enacted in 1975 in response to what the Legislature perceived as a medical malpractice insurance crisis that threatened the quality of health care in the state. [Citations.] MICRA includes a variety of provisions calculated to reduce the costs of medical malpractice insurance by limiting the amount and timing of recovery in cases of professional negligence." (*Lathrop v. Healthcare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1418 (*Lathrop*).) MICRA statutes are scattered across various codes. (*See Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1514 [listing statutes].) The only statute at issue here is Civil Code section 3333.2, which provides, "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and

21

other nonpecuniary damage.  [¶]  (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."[6]

The question is whether Flagstone may avail itself of the MICRA cap even though it is, undisputedly, not a health care provider.[7]  We conclude it may not because its liability was not purely vicarious through Costa Victoria.  Instead, the jury found Flagstone was 20 percent at fault for Cohoon's death, and that Flagstone's employee acted negligently.  Defendants do not challenge the sufficiency of the evidence supporting those findings.

The evidence supporting those findings is that Costa Victoria's licensed facility administrator, David Jorgenson, was a Flagstone employee who oversaw another nursing facility besides Victoria Center.  As the licensed administrator, Jorgenson was ultimately responsible for managing the facility, including hiring at Victoria Center, and one of Cochrum's theories of negligence was that Victoria Center was understaffed.  We concluded above that the understaffing did not amount to recklessness, but defendants do not challenge Cochrum's contention that the understaffing breached a duty of care.  Thus Flagstone was itself liable through the act of its employee, Jorgenson.

---

[6]     Cochrum does not dispute that MICRA applies to Costa Victoria's liability on the wrongful death cause of action.  She does not contend, for example, that the negligence was not based on *professional* negligence, rendering MICRA wholly inapplicable.  We thus assume MICRA applies to Cochrum's claim.

[7]     Section 3333.2 defines a "'[h]ealth care provider'" as "any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider."  It is undisputed that Flagstone does not qualify.

22

This fact distinguishes the present case from *Lathrop, supra,* 114 Cal.App.4th 1412, the case defendants most heavily rely on. There, a plaintiff sued doctors and the partnership that employed them for medical malpractice. (*Id.* at p. 1417.) A jury found the partnership 58 percent liable for plaintiff's damages, which included $2.1 million in noneconomic damages. (*Ibid.*) The trial court held MICRA did not apply to the partnership, and it appealed. (*Id.* at p. 1418.) On appeal, the court held the partnership was not a "health care provider" under section 3333.2, and thus could not directly avail itself of the limitation on damages. (*Id.* at pp. 1419-1420.) However, because its liability was purely vicarious through respondeat superior, it was entitled to assert whatever defenses the doctors could assert, including the MICRA cap. (*Id.* at pp. 1421-1423.) The court premised this conclusion on its analysis that "there was no basis for a jury finding of direct negligence by [the partnership] as an entity." Instead it "was held vicariously liable for the professional negligence of [the doctors] under the doctrine of respondeat superior." (*Id.* at p. 1422.) From that conclusion, the court framed the issue as follows: "The key question before us is whether the MICRA cap on noneconomic damages extends not only to health care providers but also to defendants *held vicariously liable* for the professional negligence of a health care provider under the doctrine of respondeat superior." (*Ibid.*)

That is simply not the issue before us. Flagstone was held vicariously liable for the acts of Jorgenson, not the acts of Costa Victoria, and it is undisputed that Jorgenson is not a health care provider under MICRA.

Defendants emphasize the jury's finding that Costa Victoria and Flagstone were "engaged in a Joint Venture." "A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." (*Nelson v. Abraham* (1947) 29 Cal.2d 745.) "There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an

23

ownership interest in the enterprise." (*Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666.) Where a joint venture is established, the parties to the venture are vicariously liable for the torts of the other in furtherance of the venture. (*Dixon v. City of Livermore* (2005) 127 Cal.App.4th 32, 42.)

A joint venture, however, does not obliterate the distinct identity of the parties to the venture. The jury explicitly found that both Flagstone and Costa Victoria acted negligently, and it was able to parse their relative fault. The joint-venture finding may have implications for how the judgment can be collected, but it does not change the fact that both parties acted negligently. Because Flagstone's negligence was independent of Costa Victoria, and not purely vicarious, Flagstone cannot piggyback on Costa Victoria's MICRA defense.


DISPOSITION


The judgment is affirmed. The parties shall bear their own costs on appeal.[8]


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

---

[8] Defendants' unopposed motion for judicial notice of the legislative history documents pertaining to Senate Bill No. 679 (1991-1992 Reg. Sess.), which amended aspects of the Elder Abuse Act, is granted.

Filed 8/8/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DONNA COCHRUM, as Personal Representative, etc.<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COSTA VICTORIA HEALTHCARE, LLC, et al.,<br><br>    Defendants and Appellants. | G052934<br><br>(Super. Ct. No. 30-2013-00679676)<br><br>O R D E R |

Horvitz & Levy LLP has requested that our opinion filed on July 12, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

GOETHALS, J.